We're ready to hear argument in our second case, United States v. McCoy. Mr. Attias, whenever you're ready. Good morning, Your Honors, and may it please the Court. The First Step Act changed the Compassionate Release statute in one way relevant to this appeal. Prior to the First Step Act, only the BOP could move for Compassionate Release on an inmate's behalf. Now, after the First Step Act, inmates may personally file motions for Compassionate Release in the District Court. This change, however, was entirely procedural in nature. Nowhere in the First Step Act did Congress grant District Courts the substantive authority to define their own criteria for Compassionate Release. The District Court, however, concluded that after the First Step Act, Subdivision D of the relevant policy statement conflicted with 3582C1A, and that, therefore, it could usurp the BOP's role under that subdivision and create its own criteria for Compassionate Release. The Court went further, though. Not only did the District Court hold that it could define its own criteria for Compassionate Release, it further held that it could implement explicitly non-retroactive statutory amendments via Compassionate Release. Either of these conclusions is sufficient to warrant reversal. I'd like to start with the District Court's conclusion. Justice Harris. Sorry. On the first point, where the District Courts held that the policy statement was inconsistent with the First Step Act, I have sort of a threshold question. Before you even get to whether there is an inconsistency, the policy, it has to be an applicable policy statement. And I'm not understanding how this policy statement, 1B113, is applicable here. Because by its terms, all it says is what happens when the Director of Bureau of Prisons files a motion. And it says, upon a motion from the Director of Bureau of Prisons, all of this stuff will follow. But there is no policy statement for what happens when a defendant files a motion. So how is this an applicable policy statement for purposes of that consistency requirement? Judge Harris, the Commission has to do two things to bring the policy statement up to speed with the statute. First, and I think this is a reference to the language you're referring to, it has to update the prefatory language of 1B113 to reflect that defendants may now also move for compassion release. Right. And at that point, we'll have an applicable policy statement. But right now, we just don't. Well, we concede that there are parts of the policy statement that are either in conflict or need to be updated. But none of that goes to Subdivision D, which is the relevant provision in this case. But why is this an applicable policy statement when it doesn't say anything about what happens when a defendant files a motion? By its terms, it begins, upon motion of the Director of the Bureau of Prisons under this statute, and then a bunch of very important stuff follows. But I just don't see how you would say when a defendant files a motion that this is applicable. I mean, by its terms, it doesn't cover it. Well, I think that argument goes both ways, Judge Harris. I think if this is not the applicable policy statement, then there may be – you could equally argue that there would be no compassionate release because there's no criteria that the Commission promulgated. But we have no problem saying – and courts throughout the country have had no problem using 1B1.13 on a daily basis to adjudicate compassionate release motions. They simply now know that under 3582C1A, inmates may also move on behalf of themselves and that it's not just the BOP who can do that. But our main position is – I'm sorry, you guys. This is my last question. So you're suggesting if there's no applicable policy statement, there can be no compassionate release on a defendant's motion? Well, that could be a consequence. Well, is that the government's position? Is that the government's position? That until the Sentencing Commission acts, there will be no compassionate release on a defendant's motion? Because I don't read 3582 that way, but tell me if you do. Well, that's not our position in this case because we don't need to go that far. We have a policy statement which district courts have been able to navigate, notwithstanding the fact that the prefatory language of 1B1.13 needs to be updated, and as do Application Notes 4 and 5. But I think it's critical to realize that in all three instances, prefatory language and Application Notes 4 and 5, the operative language there is upon a motion or pursuant to a motion. And Subdivision D is just different. And we know that immediately because the word there is a determination. And Subdivision D doesn't require updating because it's just not in conflict with the statute. If you were to line the two of them up, you wouldn't find conflict. So our position here is that the First Step Act brought about a procedural change and that it had no impact on the substantive criteria that courts can consider when ruling on a motion for compassionate release. And the district court disagreed and held that it had the statutory authority to define the contours of its own discretion and that providing a role for the BOP in determining the existence of other reasons would play. Yes, Ms. Thacker? Under the First Step Act, the defendant can file his or her own motion if the BOP has already declined to file a request, correct? Yes. All right. Then why would Congress intend that the BOP determine whether extraordinary and compelling circumstances exist when the BOP would have already done that based on the statute? They would have already declined. I mean, it doesn't make any sense. It's going back to Judge Harris's question that there's no applicable policy statement here. Well, I don't think there's anything inherently unusual about a system which eliminates a procedural hurdle but keeps a substantive decision-making authority with regards to one criteria with the BOP, and that's Subdivision D. Inmates may move freely under Subdivisions A through C, and they do that every day in district court, but if a BOP denies a motion, that's where the First Step Act kicks in. They now can come to district court and litigate that issue. And then the district court determines the extraordinary and compelling circumstances, as the courts did here. The district court determines whether the criteria of 1B1.13 are met. What the district court did here is read into the First Step Act. And what's the criteria of 1B1.13 as applicable to the First Step Act that we're talking about here? 1B1.13 Application Note 1 lists out four circumstances where extraordinary and compelling circumstances could exist. It could be family, medical, or health, or age-related criteria. And then there's Subdivision D, which was not changed by the First Step Act, but which the district court viewed the First Step Act's procedural change to mean that it now had the substantive authority to create its own criteria for compassionate release. And we know that that was wrong because under 994A2C and Subsection T, it's the commission's job to promulgate the substantive criteria for compassionate release. But the commission hasn't done that job here yet because it hasn't changed the policy statement. Well, the commission doesn't need to change the policy statement. Well, the commission says it needs to change the policy statement. The commission said itself in its 2019 report that it needed to change the policy statement to comply with the First Step Act. That's right. The commission said that it needs to change the policy statement to reflect the fact, the procedural fact that inmates may now move on their own for compassionate release. It didn't say anything about the substantive criteria with regard to Subdivision D. I think that's necessary. I'm just having a lot of trouble with this substance procedure distinction. Sort of at the front end of the statute, or at the front end of the policy statement, I should say, right now you have BOP as sort of a gatekeeper. BOP gets to decide whether you've satisfied any of these provisions. And at the back end, under the catchall, you have Bureau of Prisons playing precisely the same gatekeeping role. If letting BOP make the decision is a matter of procedure at the front end, it's procedure at the back end. And if it's substance at the back end, I don't understand why it's not substantive at the front end because then you're letting BOP decide whether A through C has been satisfied. I just don't understand how BOP playing a gatekeeping role can be substantive in one context and procedural in another. It sounds all procedural to me. After the First Step Act, the BOP still has the statutory ability to move on behalf of inmates. The First Step Act said that inmates now may move on behalf of themselves, but it didn't strike the BOP's ability to move on behalf of inmates. Right, and I agree. This policy statement continues to apply. It's not like it's defunct. It absolutely applies when Bureau of Prisons brings a motion. I think that the BOP could bring a motion under Subdivision D, and that's because it retains its statutory ability under 3582, even after the First Step Act, to do exactly that. I think any other reading of Subdivision D that grants district courts the ability to promulgate their own criteria for compassionate release is always going to run into 994T, which tells us that it's the Commission's job to do just that, and nothing about the First Step Act changed that. And so, too, with regards to 358- Am I invisible? I don't understand this. Yes, Ms. Thacker. I've almost lost my question. I don't understand how- So you're saying that the Bureau of Prisons, under both the old and the new regime, has the ability to make the motion. I understand that. But then, under the First Step Act, if the Bureau of Prisons declines to make the motion, the defendant can make the motion on his or her own at that point. Then who decides whether the criteria are met? Then the district court decides whether the criteria of Subdivisions A through C are met. Wait, what about D? Subdivision D is premised on a determination by the Bureau of Prisons- It used to be. So you're saying that the First Step Act changed nothing about Subdivision D. That's correct, and we know that, Your Honor. It changed nothing about Subdivision D. Then why does the Sentencing Commission annual report say that a newly constituted commission will need to amend the Sentencing Guidelines 1B1.13 to reflect the new authority for a defendant to file a motion for compassionate release? Because that's exactly what it needs to do. It needs to reflect, in the prefatory language- It needs to reflect that nothing has changed. No. One specific and very important thing has changed, and that's the fact that inmates may now move on their own. That's a C change, and the commission needs to reflect that. I think what the commission is alluding to- And when the inmates move on their own, you're saying that it's still the authority of the Bureau of Prisons to determine whether the criteria has been met? Well, an inmate couldn't move on their own in the subdivision capacity. Only the BOP could do that, and that's exactly why the BOP has retained its statutory ability to move under Subdivision D and in the statute. I don't want to delay your argument anymore, because I know you're over time, and I don't think you and I are going to come to an understanding. Mr. Mattias, you are over time, so I'm going to stop you. You've got some time left for rebuttal, and we're going to hear from your colleague, Mr. Medinger. Thank you, Your Honor. May it please the Court, Jason Medinger for the United States. In our view, Your Honor, federal law simply does not permit the district court to do what it did here, so we do respectfully ask that this court would reverse. What I want to do is jump right into a question that was asked by Judge Harris, because I think it is an important one about is this or is this not the applicable policy statement. I'll say two things on that. First and foremost, I don't actually hear the defendant saying that it's not the applicable one, so I don't think that's an argument the defense is making. But the second thing I'll say is I think we all need to do our best to sort of ensure that as much of what Congress wanted this structure to be is kept in place. And so let's continue the thought experiment. 994T says that the Sentencing Commission shall determine what is and isn't extraordinary and compelling. And so they've listed examples. They've enumerated the application notes that we've all been discussing. And I don't think it's the best construction, given that Congress wants the commission to decide these issues, to just reach a construction that throws all of that structure out. And I think if you look at what is left of application notes – oh, yes, Judge Harris? Well, what the district courts are saying is not we want to throw it out. They'll continue to treat it as advisory. It's not as though A through C disappears. They continue to rely on it, but it's not binding in the same way. Right. And that runs precisely, Your Honor, I think, into the buzzsaw of the words in 3582C, which says it has to be consistent with. And that really is the heart of our argument. Great. Let's go to the words. Thank you. I've been thinking about the words a lot. So what it says is that it has to be consistent with applicable policy statements, plural, issued by the Sentencing Commission. So is it the government's position that any reduction has to be consistent with more than one policy statement? So the applicable policy statements, I think Your Honor's question is there's a plural there? And is that what you're getting at, Your Honor? It is what I'm getting at. And I think our answer would be the applicable policy statement here really is 1B1.13. Yes, Your Honor. Right. And what I'm getting at is I think the only sensible way to read this language, you wouldn't need applicable and it wouldn't be plural. If it meant that a reduction has to be consistent with a policy statement issued by the Sentencing Commission, that's what it would say. Instead, it says it has to be consistent with applicable policy statements, plural. And I think the only sensible way to read it is the way courts have long read it, which is to mean if there are any applicable policy statements, plural, it has to be consistent. It can't be inconsistent with any applicable policy statement, whether it's one, two, or three. Right. And, Your Honor, I guess my resort to that would be, and forgive me if I'm wrong on this, but I think I'm not. If you look at 3582C2, I think the language is exactly the same. And then we go to the Dillon case, which we rely, frankly, pretty heavily on, which interpreted 3582C2. And there the Supreme Court looked at just one policy statement, 1B1.10. And so I think perhaps what I would retort respectfully, Your Honor, is that we shouldn't read too much into the plural versus not plural. I think everybody agrees, and the defense, frankly, is not arguing this either, 1B1.13 is the whole shooting match here. That's the only policy statement that applies, and it shouldn't give us heartburn that there's only one. And so we have to be consistent with that policy statement. And here the district court was saying, I don't have to be. I can be inconsistent, and that's perfectly okay. And our view is that that violates the law. It violates 3582C1A. It also violates 9914. So that's really the heart of our argument, Your Honor. I'd also like to address a question, if I could, that Judge Thacker asked, and it was the question about, you know, why would we allow a construct, or why would Congress, when they pass the First Step Act, allow a construct that allows BOP to either deny a motion or to not make one, and then to sort of have the district court, you know, look at it again. And I think the answer lies in why the First Step Act changes were made that were made. And I think if you read some of the legislative history, which, again, we don't think we need to consult, but if you read it, I think the primary problem here was that there were instances where defendants fell under the criteria listed in Application Note A, B, and C, that BOP was actually not making the motion. And so we're still looking at the Commission's pre-approved criteria, but we're just giving the defendant the ability to say, hey, the BOP missed this one, I really do have a terminal illness, or I really do have a caregiver that passed away, and that's important to me. District court find as a fact whether that exists. Judge Diaz. But the one thing you don't focus on is the example of a prisoner who says, I really have extraordinary and compelling circumstances under Subsection D. The BOP either didn't take action or denied the motion outright. In the former case where the BOP doesn't take action, isn't there a vacuum there? I mean, what are courts supposed to do in that instance? Well, I guess my response to be that district courts absolutely cannot fill that vacuum themselves. Let's say there is, and I'll take your point. Some defendants think that there are extraordinary and compelling circumstances that they have, but there's absolutely no provision that allows district courts to sua sponte, usurp that role. In fact, Congress said district courts, you cannot. This is the Sentencing Commission's regime. Yes, Judge Harris, I see you. I don't know which way to move, so my hand's in the way.  There needs to be a catch-all provision. We can't sort of lay out all of the possible things that might qualify as extraordinary and compelling. There has to be a catch-all provision. When it comes to defining what counts under the catch-all, it's permissible for the commission to delegate that responsibility to the Bureau of Prisons, but it would be a violation of federal law to delegate that responsibility to the courts, notwithstanding that the whole point of the First Step Act is to get the Bureau of Prisons out of a gatekeeping role and give more room to the courts. That's how you understand the lay of the land? So I think generally, yes, but a couple points of clarification, Your Honor. First, I don't think it's correct to say that Congress wanted to get BOP completely out of the game, and I take your point. You used the word gatekeeping role, and I think that change was made, but again, we're not trying to shunt the BOP completely out the door here. And the reason for that, I think, the real reason, BOP is closer to the ground. It understands unique circumstances that are going on in their prison populations and their defendants, so we're going to give them their due. This is their area of expertise, and so we're going to allow them to exercise that. But the Sentencing Commission did that, and it's okay for the Sentencing Commission to do it because Congress said they could, but Congress did not say district courts can do it, and they can't do it on their own, sua sponte, and so that's really the crux of our argument. So is it the government's position that the Sentencing Commission could not come back after the First Step Act and remove BOP from that gatekeeping role under the catch-all? Could the Sentencing Commission do that or not? Would you say that's inconsistent with? Oh, certainly, the Sentencing Commission could amend its rules. I guess the problem that I'm stewing over is that if you look at the First Step Act amendments, they actually still allow for a motion by BOP, and so I think it would be sort of problematic for the Sentencing Commission to say, BOP, you're completely out of the game. We're not going to let you act in this arena at all. Oh, I'm sorry. I guess all I meant is I may have been imprecise, and I apologize. In your view, after the First Step Act, when the commission finally does issue an applicable policy statement, could it keep everything the same for when BOP files the motion, but say that when the defendant files a motion, the defendant can get relief under A through D, and D no longer includes a gatekeeping role by BOP? So on a defendant's motion, it will be up to the courts to decide whether A through D has been met. Yeah, so I guess the reason why that's a very difficult question, Your Honor, is it kind of creates an interesting little echo, right, in the sense that Congress said that a grant of compassionate release has to be consistent with what the Sentencing Commission says, and then I think if I understand your hypothetical right, the Sentencing Commission would then have to say, it's consistent with 3582 if, on an application note D motion, the district court is able to determine that, if I'm understanding you right. And, you know, that's an interesting hypothetical because I, in some respects, It's not a hypothetical. It's the most, excuse me, I don't think it's a hypothetical. It is the most obvious thing that the Sentencing Commission might do when it does have an opportunity to issue a policy statement under the First Step Act for what happens when a defendant files a motion. The obvious thing, one very obvious alternative would be, now that Bureau of Prisons is no longer in charge of filing these motions, we're taking it out of its gatekeeping role altogether. And I am wondering whether the government's position is that it can't do that, that somehow we live in a legal regime under which it is permissible for the Sentencing Commission to delegate its authority to define what counts as an extraordinary and compelling reason to the Bureau of Prisons, but not to federal courts. Because that seems unusual to me. Right, so understood, Your Honor. And again, I don't want to quibble whether it's a hypothetical or not. I guess our point only at this point is the Sentencing Commission hasn't done what you propose that it might do. And so for purposes of this case, we would just say there's really no power to do that. This court can't rewrite what the Sentencing Commission hasn't done yet. But I also think, just sort of on a larger basis, I can't see why the Sentencing Commission would want to do that. Because then you get into the parade of horribles that we discussed, the sort of patchwork, ad hoc scenarios. And that is frankly already playing out if this regime is affirmed. In other words, in the District of Maryland, and forgive me, Your Honor, I'm a little bit over my time, actually a lot, but if I could just finish this point and then I'll conclude unless there's other questions. We're already seeing these disparate activities play out. In Maryland and Virginia, stacked 924Cs were determined by the district judges to be extraordinary and compelling. Just a couple weeks ago, in a case out of the Eighth Circuit, United States v. Loggins, the district court there said, no, they're not extraordinary and compelling. So in terms of just sort of a national policy. But aren't those courts, when they say those stacked sentences either are or are not extraordinary and compelling, they're looking at each individual defendant and his or her background, things they may or may not have done in prison. It's not a wholesale, oh, in every case in the District of Maryland, stacked sentence is going to be extraordinary and compelling. Or in every case in some other district, a stacked sentence is not going to be extraordinary and compelling. So the district courts are simply engaging in what district courts are asked to do. Look at each individual defendant circumstances when sentencing. Isn't that right? Well, so I disagree, Your Honor, because I think where you're going, where there is that disparateness, that's actually under the 3553A prong here, whereas what we're most concerned about as a threshold legal matter, just a pure legal statutory construction matter, are 924Cs stacked enough? And some judges are saying, yeah, they are. And some judges are saying, no, they're not. Go ahead, Judge Diaz. Go ahead, Judge. So you're saying that there are district courts that are just, as a blanket rule, saying stacked sentences under 924C are enough or are too much, just as a blanket rule, without looking at individual defendants? And which district courts are doing that? Right. So we're looking at sort of the threshold question of, have you reached extraordinary and compelling or not? And then you get to those ancillary questions of, have you met 3553A? And so what I'm talking about on that first step, are we, as a threshold matter, have you established extraordinary and compelling or not? What I've seen, and again, it's very early. This case law is still developing. In both Maryland and Virginia, as you saw, the cases that are before you here, the judges in those cases said, yes, those are sufficient. And I take your point that, you know, maybe those decisions are impacted by the individual circumstances. Oh, the transcripts, I think, reveal that they are impacted by the individual circumstances. The judges, at least in the cases we're looking at, went into great detail about each individual defendant's history and criminal conduct in deciding. So if you do have a district court case where the district court is just blanket saying, no, we will not do this under any circumstances, or yes, we're going to do this under every circumstance, I'd certainly be interested in that. Yeah, and again, the closest thing I've got for you right now is that Loggins case, and I can file a 28-J if the court would like. But I think, in our view, it reaches that construct where you get this disparateness that the Sentencing Reform Act was, frankly, designed to avoid. We're getting into sort of this ad hoc patchwork system that doesn't allow. Actually, I'm sorry to interrupt, but you've answered, at least to the best of your ability, my question. So Judge Diaz, I thought, had a question. No, Judge, you asked a question that I was thinking about, so it's all good on my end. Mr. Mettinger, you're over your time. We're going to hear from Mr. Gleeson. Thank you. Thank you, Your Honors. Mr. Gleeson. Thank you, Your Honor. John Gleeson on behalf of the appellees. Let me begin by responding to the colloquy between members of the panel and my adversaries first. In connection with this last one, since it's fresh in my mind, all the cases with which I'm familiar involve precisely what happened in these four cases. Individualized, no per se determination that stacked 924C defendants are entitled to relief, but as is the case with McCoy and Bryant and Scott and Decatur, because these are not all fungible individuals. They have different measures of rehabilitation. They have different, no relevant criminal history, a near perfect disciplinary record, mentor, suicide watch companion, Craig Scott. These are individuals, and judges have made, Judge Thacker, judges have made, and we represent a number of them, and the ones in which these sentence reductions have been granted have been precisely the kind of holistic determinations that Congress vested in Article III judges, not in the Bureau of Prisons. It is true. This relates to Judge Harris's initial question. It is true, and what I'm going to attempt to do, if the Court will permit me, is to root these concerns. I'm going to suggest respectfully this isn't nearly as complicated as the government wants you to think it is. These concerns that have been expressed can be rooted directly in the controlling precedents and statutes. For example, 3553A is right under our noses. Every single sentencing, every single sentence reduction requires a judge to consider the factors in 3553A, which say that the judge must consider the applicable policy statements, and then it says, and we don't notice this, we live it every day, and then it says, taking into account any amendments made to them by act of Congress, regardless of whether such amendments have yet to be incorporated in the sentencing commission, by the sentencing commission, and Judge Harris, several judges, Judge Trenga, the ones that leap to mind, Judge Trenga in the Derek Redd case looks a lot like the three cases from Maryland that are before you now, but wasn't appealed by the government, said, look, we have no commission amendment. There is no applicable policy statement with respect to sentence reduction motions made by defendants. The commission hasn't gotten here yet. There is no applicable policy statement with which the sentence reduction must be applicable. And you can rely on that. It is true that we certainly believe, consistent with 3553A-5, that by taking into account a statute that was explicitly intended to take BOP out of its gatekeeper role, that even if 1B1.13 is determined by the court to be an applicable policy statement, the court has to disregard the extent to which the policy statement places BOP in the gatekeeper role that we've all been talking about. We had Judge Trenga said, this is a statute intended to remove BOP as gatekeeper. And the government, I'm sorry, this is Judge Jackson in the case before us, said this is a statute intended to remove BOP as gatekeeper, and the government is trying to entrench it as gatekeeper. This is not difficult stuff. The other sources of authority I'll respectfully suggest to the court, and this is by no means an exclusive list. There are a lot of decisions, a couple dozen decisions, in which district judges have acted on the concerns expressed by Judge Harris and Judge Thacker. But I'll suggest in the time I have available three principal bases for this court's authority to disregard that prefatory language in 1D and not create a different world, a world in which instead of as contemplated by the statute and the policy statement, judges decide whether extraordinary and compelling reasons other than medical condition, age, and family circumstances warrant a reduction. The BOP, the government wants that to be relegated to the Bureau of Prisons, which never opened a gate on that ground. But the other source of authority I'll suggest to the court respectfully is Dorsey. Dorsey says statutes trump guidelines, and most importantly, Justice Breyer's decision in Dorsey says here's the key. The key is to see, you look to the language of the statute, the structure of the statute, its basic objectives, and give meaning to it. And it's not legislative history. The title of the amendment to the Compassionate Release Statute, Section 603 of First Step, is to increase the use of sentence reductions. The notion that in the face of a statute specifically intended to take a gatekeeper who hardly ever opened the gate out of the middle and then say, no, no, no, they remain in charge, lies in the face not only of 3553A5, but in the face of the doctrinal approach that Dorsey asks this court, requires this court to take. The third basis I want to mention is slightly different, and, Your Honors, it focuses on the difference between policy statements and commentary. It's really significant that what the government is relying on is this snippet of vestigial language in 1D, in the commentary. And the reason is because if you read that phrase, the reason it's important, is if you read that phrase in the commentary the way these government lawyers are asking you to read it, it will bring the commentary in direct conflict with both the statute and the policy statement itself. Both the statute and the policy statement make it crystal clear that Article III judges decide whether extraordinary and compelling reasons other than or in combination with the specified ones warrant a sentence reduction. And to have just as statutes trump policy statements, the Stinson case, Supreme Court's case in Stinson, says policy statements trump commentary. So even if the government were to succeed in its, as Judge Backer pointed out, this kind of counterintuitive, this notion that BOP denies to make a motion on this ground, so now the defendant can go to court and make his own motion, and the judge can't decide. Even if they were right that that prefatory language in 1D said what it says, it would bring the – yes, sir. I'm sorry. All right. Can I – let me ask you this. So could the Sentencing Commission eliminate subsection D altogether if it wanted to? What I understand from the government's concerns is that what this is turning into is a de facto parole system, which, in fact, obviously Congress eliminated some years ago. And now we're reverting to a system which effectively has the same unintended effect. So would it be appropriate for the Sentencing Commission to simply say we're not going to – we're just going to enumerate factors, but we're not going to allow or use of the catch-all, whether by BOP or the courts in these kinds of motions? Well, Judge, in my view, respectfully, I think the Sentencing Commission will do precisely what Judge Harris predicted it will do. But let me say emphatically that the current lay of the land, we're now almost two years past the First Step Act, and this bears no resemblance to a de facto parole system. It bears no resemblance to a system in which, as the government has argued on occasion, it's an end run around the decision not to make the amendment to 924C retroactive. We know what that looks like. We've seen it with the retroactive Fair Sentencing Act reductions. The Sentencing Commission report said in 2019 alone there were 2,387 sentence reductions. Our – as Judge Jackson pointed out, our clients have been forced through a much narrower portal. And almost two years into it, what do we have? A couple of dozen. There's not been any – they know. We know because we screen them. They know. There's no flood of applications in the district courts. They know what it means to have to satisfy extraordinary and compelling circumstances. They know that that, unlike a world in which these amendments might have been made retroactive, they know that implicates inquiry into offense characteristics, into the degree of their rehabilitation. They know how hard it is. And the – what we have, the data we have so far, show how hard it is. And one point I can't make more emphatically, and that is this notion advanced by my adversary that if you rule against the government, it will offend the goal of the Sentencing Reform Act to eliminate unwarranted disparities in sentencing. There are no disparities that come even close to the ones produced by the government in the way it has deployed this 924C stacking provision. These sentences are breathtaking. And if I may, Your Honor, would I – a point I cannot make emphatically is – Hold on a second, Mr. Gleason. We lost Mr. Mettinger, so let's see if we can get him back. Mike, are you there? Mr. Mettinger, can you hear me? I can, Your Honor, and I apologize for the glitch there, and I apologize to Mr. Gleason as well. Thank you. That's okay. Mr. Gleason, go ahead. Well, since we've got this break, can I ask you a question? You mentioned stacking and the extraordinary, breathtaking sentences, I think, is the way you described it. And then you, I think, conceded quite candidly that Congress, notwithstanding the disparities that you suggest, were imposed by stacking sentences, did not elect – didn't choose to make the change retroactive. And so I guess my question is, what is it about the stacking, given the fact that there are a number of defendants who were subjected to it, that makes it extraordinary? And what is it about rehabilitation, which the statutes and regulations make clear by themselves, is not intended to be extraordinary? What is it about the combination of these two things that suggests that your clients and other similarly situated clients really are intended to be encompassed by this catch-all provision? Of course. And if I can append to the beginning of the answer to that question a little bit more answer to your last question, please bear in mind that the whole point of the original enactment of 3582C, C1A, was to substitute for that opaque parole review by the commission of every sentence a very narrow judicial authority, put it back in the hands of judges, a second look at a narrow subset of sentences, only those cases that present extraordinary and compelling circumstances. So it's a narrow window that Congress created by amending the compassionate release statute to allow clients like ours to make their own motion. And it is true that although rehabilitation alone by statute and pursuant to the policy statement can't be a reason for a sentence reduction, it's also obvious that rehabilitation is an important consideration and must be considered. And the second answer to your question is this. Here's what makes, it's a very small window. And truth be told, how wide that window is open to clients like the inmates in federal prisons is dictated in part by the text of the statute and the policy statement. I mean, extraordinary and compelling suggests narrowness. It's going to be informed by decisions, including by this court, as you put a judicial gloss on what it means to present extraordinary and compelling circumstances. I want to suggest to you, though, that no matter how narrow it is, it will include cases like the ones before you now. And that's because for decades, Judge, these extraordinary, so extraordinary that Congress eliminated them, these extraordinary enhanced sentences have never been used, they've never been based on a defendant's culpability, on a defendant's, the offense conduct. For decades, they've been used by the Department of Justice by reference to one fact and one fact alone, whether a defendant pleads guilty. They've been used, these bone-crushing 20 and then 25-year enhanced sentences are used to induce people to plead guilty. You have before you Thomas McCoy. Worked for him. He took 32 years guaranteed, but if he went to trial on his 12-924Cs, he would have had 282 mandatory years. And they've been used to punish people who don't plead guilty. Read Keith Bryant, Craig Scott, and Cottrell Decatur, who got their 50-year sentences plus because they went to trial. And so in addition to their unusual length, yes? Counsel, I want to back you up for a second if I can to Judge Diaz's question about whether the commission could, if it wanted to, just get rid of the catch-all provision altogether. But let me, what I'm really trying to get my hands around, and it's related to that question, is it seems to me there are sort of two different theories under which you could be going, and I want to make sure I understand which one it is. One would be to say, look, the Sentencing Commission has not made a judgment here that when a defendant moves for a reduction, the defendant can't invoke the catch-all provision unless BOP approves. We don't have a commission policy saying that. So there is nothing here to bind the judges. Another way to think about it would be that the commission can't have a catch-all provision that uses BOP as a gatekeeper, period, after the First Step Act. It might be able to get rid of the catch-all provision entirely, but the one thing it cannot do, consistent with the First Step Act, is put the Bureau of Prisons in this gatekeeping role in between a defendant filed petition and relief. So, you know, on one theory of your case, the district courts can do what they want here because the Sentencing Commission hasn't said anything. On another theory, it would be, look, we can maybe assume that the Sentencing Commission maybe wanted this to continue to apply. There's no reason to do so, but we could assume that, in which case it would just be inconsistent with the First Step Act to maintain the catch-all with the BOP gatekeeping requirements. So which is your, and maybe you're arguing under both, but which theory are you pushing? Yes, you can affirm on either ground. The notion that you mentioned at the outset, that there is no applicable policy statement, has great traction, no question about that, and some district judges have relied upon it already. But I'm suggesting to you that even if 1B1.13 is the applicable policy statement, you have to read out, just as we read out the upon motion of the Bureau of Prisons, which is in there three times, you have to read out, you have to take into account, as 3553A5 says, the acts of Congress that are inconsistent with it, whether the commission has acted or not, and that's what's applicable. So the applicable part of the applicable statement does not bind the judges. To go back to the question, Mr. Judge. I have one follow-up. There's a sense in which, as we look at this new statute, there's not a lot of law under it. It would be somewhat narrower for us to hold, there's no commission policy statement here, period. And that's what allows the district courts to kind of exercise their discretion here without reaching the question of whether the commission could, when it has a chance to issue a policy statement, keep the BOP in this gatekeeping role. I mean, it would be a slightly smaller decision, right? Well, Judge, I don't see why you would ever reach the decision now, in this case, whether in the future the commission could permissibly eliminate subsection D. And by the way, it couldn't. Oh, that's not what I meant. Because I'm with you. You know, I go back to the statute. The face of 3582C1A, and we know from the legislative history, it was intended to allow a judicial second look for unusually long sentences, among other things. And the face of the statute says a judge in any case, when determining that there are extraordinary and compelling reasons warrant a reduction, can do so. Now, is the commission authorized by 994T to articulate criteria? Yes. And it did. And it says in the background note at the end of 1B1.13, we did our job. Here are the criteria, age, medical circumstances, family circumstances, reasons other than or in combination with those. So in the future, could it backtrack and eliminate D? I don't know why it would. But the last thing that's before this court now is projecting what the commission could do or might do and ruling on my challenge to a commission decision to eliminate subsection D entirely. The last thing I want to say, I see my time is up, is almost up, or is up. I can't tell what these lights are. But if I may, Judge Diaz, can I make one more point to go back to the other point? Look, I'm going to call the government out on this. And with all respect, so should this court, in addition to the unusual length of these sentences and the disparity the government produces by using these 924C enhancements to procure guilty pleas and punish those who don't plead guilty, there is this, it's a blight on our system, there is this sorted, racially discriminatory deployment. Part of it set forth in our brief in 2004. You know, the commission doesn't often ring alarm bells on behalf of defendants. In that 15-year report, it said this is deployed for decades in a racially discriminatory manner. Black men comprise 48% of those who are eligible for 924Cs, but they're 64% of those who get stacked 924Cs. In that humongous 2011 mandatory minimum report to Congress, the commission said it's still happening. It's still racially discriminatorily deployed. And Congress, this is the commission, says to Congress, you should get rid of this. You should allow it to be concurrent. You should lower these sentences. You should make it a true recidivism statute like it eventually did. And the last piece of this, Your Honors, and I'm sorry it's not in our brief, but it's a report on the commission's website from March of 2018, ten months before Congress amended the statute. I'm sorry, March, yes, ten months before Congress amended the statute. And it says it's still happening. The racially discriminatory use of this statute is still happening. So ten months later, finally, Congress does something about it. And I'm going to suggest to you, you know, you look at this brief, there is no sense in which there's any claim of abusive discretion in Thomas McCoy's case. But you look at the description of the crimes. His robberies resulted in a guideline range of 37 to 46 months because the robbery guideline takes care of things like described in there. And you see these words in there, predatory, terrorizing, ambush. You know, it's all of a piece with a deployment of these ridiculously harsh sentence enhancements that have now been eradicated that makes these cases, I'll suggest respectfully to you, Judge Diaz, makes these cases more likely than most to fall comfortably within, no matter how narrow this Court decides, extraordinary and compelling reasons other than age, medical condition, and family circumstances. How narrow that is, these cases more than any other, provided they have the kind of remarkable rehabilitation you see on the part of these four men. These cases are likely to fit within it. I see my time is up. Thank you for letting me go over time. Thank you, Mr. Gleeson. Mr. Attias, you have some rebuttal time. Go ahead. Thank you, Judge Diaz. If I could just address two questions the Court asked before addressing Mr. Gleeson's point. Judge Thacker, you asked whether Congress intended to undermine Subdivision D and how we could be so confident that it didn't. I wanted to point out that we know that Congress didn't intend to override Subdivision D because if it did, it would have said so. The best evidence of that is Section 8 of the Fair Sentencing Act, which directed the Commission to promulgate guidelines to reflect new minimums as soon as practicable. In fact, Congress gave the Commission emergency authority to do that. It did nothing of the sort here. That silence, I would say, is telling, and it's brought into starkest relief here in light of the fact that the First Step Act cites the BOP over 100 times. It's simply impossible to think that Congress forgot about the BOP in its subdivision role. Judge Harris, you asked if the Commission could amend Subdivision D to reflect that courts can determine their own criteria for compassionate release. I think that if the Commission did do that, Congress would have to amend Section 994T to reflect that other bodies of government can also promulgate substantive criteria, and it would also have to amend 3582's requirement of consistency with the applicable policy statements because it would likely render it absurd and superfluous. And the reason for that is that if all a district court had to do to comply with 3582's requirement of consistency is to be consistent with their own determination that extraordinary and compelling circumstances exist, it would render the requirement a nullity and likely superfluous. So in that sense, it would invite conflict with the statute. Mr. Gleason talked about the 3583 factors, and I think that brings up a critical error in this case, which is that a district court viewed a disparity issue under the factors as somehow conferring eligibility under 3582, and that's precisely the opposite. And we know that because Dillon tells us that, because Dillon tells us that, as did this court in Clawson. First, we determine eligibility under the policy statement, and any concerns that a district court has under the factors are subservient to that. The best evidence in the McCoy case is JA165, which is that the district court put the 3553 factors as the first section in the discussion portion of its analysis, which is extremely telling in this case. Mr. Gleason also talked about the text and structure of the First Step Act, and I think that's helpful because the text of the First Step Act in Section 403 and this court's case in Jordan tell us that retroactive 924C amendments don't apply to defendants like Mr. McCoy who were sentenced before the act. And as for structure, the very next provision, Section 404, tells us exactly how Congress structures a case-by-case mechanism for defendants to benefit from retroactive mandatory minimums. Compassionate release is just not that statute. And finally, Mr. Gleason talked about the commentary. Yes, the commentary is authoritative under Stinson unless there's a conflict, and there's absolutely no textual conflict in this case. The only way to find conflict is if you assume that Congress's procedural amendment intended to have substantive benefit, and if you accept that, you have to accept everything that goes with it, which is that 994T doesn't mean what it says, and the absurdity of requiring courts to be self-consistent with their own determination. Yes, Judge Harris? So I'm sorry. I'm going back to the Jordan point and the fact that Congress didn't make the stacking change retroactive. I mean, it's all part of the same statute, though, right? So these Bryant defendants, right, are serving 45-year minimums, and Congress has now made the judgment that that's 40 years more than is appropriate, right? They should have gotten a five-year mandatory minimum. They got 45-year mandatory minimums. So they're 40 years off from where Congress thinks it should be. And in the same statute, Congress says we're not making that retroactive, but we do want more compassionate releases. We want more use of that individualized safety valve. So why isn't that just sort of a perfect congressional compromise? We're not open. We understand we've made a big mistake here. We want to clarify that this never should have happened. We don't want to open the floodgates and let everybody out automatically, regardless of individual circumstances and risk to the public. But in the very same statute, we absolutely want to expand this safety valve for individual cases. Why would it be that in employing that safety valve, you can't turn around and look to what the exact same Congress did in the exact same statute, when it said, oh, my goodness, these statutes, these sentences are off by an extraordinary factor, truly extraordinary. So my first point, Your Honor, is that I think Jordan actually addresses this, and it states that the reduction in criminal penalties is always going to pose difficult line-drawn questions. I'm sorry. I'm just having a little bit of difficulty hearing, and I don't want to miss this. Can you? I said the opinion in Jordan writes that the reduction in criminal penalties is always going to pose difficult line-drawn questions. And so Congress obviously was faced with this issue. Well, I am so familiar with that opinion, as you know, and the point was there's a reason why Congress might not want to open the floodgates, and it's always going to have to draw a line between people who will automatically be released from prison and people who will not. But Jordan certainly didn't say anything suggesting that that having drawn that line as to automatic vacating of all of these sentences would somehow constrain judges from taking account of this new policy judgment by Congress under the compassionate release provisions. Your Honor, I would agree with you if Section 404 didn't exist, because Section 404 is exactly the type of mechanism you're describing. Section 404 is so much broader. That is a much, just going back to your colleague's metaphor, that window is wide open. That's just sort of, it's at the court's discretion. There's no requirement that you find it extraordinary and compelling. That's what Congress does when it wants the window pretty far open. I think 404 is a good example of how Congress structures that sort of mechanism. It might be broader, but it easily shows that Congress knows exactly how to tailor these types of procedures and made a very broad one under 404, and it could certainly make a narrower one under, you know, a 405 or 403. But it didn't do that. If it thought, it could have thought extraordinary and compelling is the right window for this, but we are paying attention to it at the same time that we are changing the stacking provision. We do want to be clear that we want that extraordinary and compelling provision to be used more often, and we want to do it by getting rid of BOP as the gatekeeper. I just don't see why it would have been necessary for Congress to have done more than that. If they were comfortable with extraordinary and compelling, that's where we want to set the window. We just want to get BOP out of the picture. Judge Harris, this Court in Goodwin refused to read silence as permission in 3582 context, and I think that's directly applicable here. If Congress intended to create that type of system or for 924Cs to constitute extraordinary and compelling circumstances after decades of cases stressing the finality of sentences and judgments and where sentences are final unless Congress explicitly says otherwise, I think it would have said so. And I hope that answers Your Honor's question. I just wanted to make one more point as to Mr. Gleason's point that compassionate release is a second chance or a second look. There's simply no evidence that compassionate release is ever supposed to be anything like 2255 or direct appeal. He stated that in his brief, and he stated that here today. There's simply no evidence other than a single piece of legislative history. As for the point regarding abusive discretion, if this Court sidesteps the issue of conflict, it could nonetheless hold that the district court committed a legal error in effectuating nonretroactive statutory amendments via compassionate release. And so in that sense, it would be a per se abusive discretion. Thank you very much, Mr. Rattayas. I want to thank counsel for their very able arguments here today. The case has been submitted. And Mr. Gleason, in particular, I want to thank you for your willingness to take these cases on pro bono on behalf of both your clients and the Court as an institution. Obviously, it's critically important that lawyers be willing to render such a valuable service as you have here today. So thank you on behalf of my colleagues on the Fourth Circuit. We would traditionally come down from the bench and greet you all individually. Obviously, we cannot do that under the circumstances. But please know that we are, again, grateful to you. We wish you the very best and that you remain safe and well. And thank you again for your arguments. The Court will stand in recess. Thank you, Your Honor. This Honorable Court will take a brief recess.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris